SUPERIOR COURT 
 
 BRADFORD CARPET ONE CO. INC. V. PIEDMONT STREET, LLC and ATLANTIC MANAGEMENT GROUP, LLC

 
 Docket:
 1777CV1274
 
 
 Dates:
 October 2019
 
 
 Present:
 Elizabeth M. Fahey, Justice of the Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 FINDINGS OF FACTS, RULINGS OF LAW and ORDER FOR JUDGMENT
 
 

             Plaintiff sued both defendants, asserting that Atlantic hired it as a subcontractor for wood flooring on Piedmont's condominiums. Plaintiff claims it did the work, much of which is not seriously contested, but has not been fully paid. After a jury-waived trial, judgment is to enter for plaintiff on its claims of breach of contract, quantum meruit and violation of Chapter 93A as to both defendants.
Findings of Fact 
            I credit the testimony of John Iorio, who was the vice president and project manager for commercial work at Bradford Carpet One Co., Inc. ("Bradford"). Plaintiff had a written agreement via emails with the manager, Kevin Cullen, of the general contractor, Atlantic Management Group, LLC ("Atlantic") for a total of $82,500.00 for installing carpet that Atlantic was to provide and to do the finish work on the wood floors. That was the total of Bradford's work until two change orders were given to, and completed by, Bradford.
            The work started pursuant to the agreement in writing under the e-mails between Iorio and Keith Cullen. The work started in August of 2015 and finished in late November 2015,
                                                            -1-
perhaps early December 2015. No issues were raised when the work was finished or with the quality of Bradford's work until months later. That included all the work, including the change orders.
            I reasonably infer that Atlantic was satisfied enough with Bradford's work that Atlantic gave plaintiff two other change orders: one for tile work installation, and the other for installation of a rubber floor. The total work that was given to and done by Bradford was for $103,390. Bradford has only been paid $25,200, the amount of plaintiff's first invoice. Bradford then submitted a second invoice for $45,000, Exhibit 13, which has never been paid.
            At some point in January or February 2016, Jos Bhogal, as one of the two members of defendant Piedmont Street, LLC ("Piedmont"), went on a view of the property with the architect and found that one bedroom floor in one of the eight units had not had a subfloor installed. In fairness, Bradford had noticed that the subfloor had not been installed and notified Atlantic but was told to just install the top floor anyway. Iorio remembers that because it is so outrageous that Atlantic would have had the finished floor installed without a subfloor; this only became noticed when that unit's prospective owner went into his unit and realized that the floor was wobbly under his weight.
            Atlantic then contacted Bradford who corrected that unit, which had been done at Atlantic's specific, though improper, direction. Bradford corrected the work, taking out the top floor that had already been finished, then installed the subfloor, and then reinstalled their finished work.[1]
---------------------------
[1]I'll come back to that because employees who work deserve to get paid for their work.
                                                           -2-
            The payments for the wood flooring are described under Division 9 (Finishes) of Exhibit 7, which is very difficult to read; maybe Atlantic and/or Piedmont want it to be that way. There was $170,466 allocated for wood flooring finishes. Adding up the four numbers that are in that column comes to $166,535, less than the amount allocated.
            The records do not reveal how much was spent for supplies[2] and how much of it was for labor. No evidence was offered that anybody else did wood flooring work other than Bradford, except for when Bhogal went through the inspection with the architect, he did see that the finish had been marred[3] in only two or three rooms within the various units. That is the only other complaint Bhogal made concerning the wood floors. Piedmont did not express any other dissatisfaction with Bradford's work.
            Bradford, having not been paid by January or February of 2016, was not going to take the time to go back and do the finish work but estimated, which estimate is reasonable, that it would cost $3,000.00 to $5,000.00 to refinish those 2-3 floors. Bradford subtracted $5,000.00 from the total that Atlantic and Piedmont owed to Bradford. Bradford then was owed $78,190 for its work as requested by Atlantic which has not been paid, to which I am adding $3,000 for going back and doing the correct work on a floor that Atlantic had initially directed Bradford to do incorrectly.
            Exhibit 4 is the contract between the owner and the contractor. It is signed by Thomas Calus, one of the two managers for Piedmont, and Keith Cullen, the manager for Atlantic.
---------------------------
[2]Even if "finishes" includes the cost of the wood flooring which Atlantic was to provide, Bradford's pricing of $103,000 for all of its work appears reasonable for all eight condominium units.
[3]This court accepts that "marring" can occur because later work occurred in that room, or equipment was used later in that room. This court accepts that "marring" does not mean a flaw in the wood floor finish done by Bradford. Floors are usually finished at the very end of a project; the marring may have resulted from other work being done in those rooms.
                                                            -3-
When Bradford was hired, Iorio had been dealing with Keith Cullen, who, as Atlantic's manager, had the explicit written authority of Piedmont to hire subcontractors. Article 3 in Exhibit 4 deals with the relationship between the general contractor and the owner. It states:
"The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents."
            No evidence was offered concerning whether Atlantic had sought approval from the owner, Piedmont, regarding Atlantic hiring Bradford by email to do the installation of the wood flooring. Under Subcontracts and other Agreements, Article 10.1 in Ex. 4 states:
"Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontractors or by other appropriate agreements with the Contractor which Owner must approve of prior to the execution of same. The Owner may designate specific persons from whom, or entities from which, the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Architect. The Owner shall then determine, with the advice of the Contractor and the Architect, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection."
This court is satisfied that Cullen, on behalf of Atlantic (and for the benefit of Piedmont) and Iorio, on behalf of Bradford, reached a contractual "agreement" in their emails. No evidence was offered that Piedmont had rejected, or never been asked to consider, Bradford as a subcontractor. I am satisfied that Atlantic entered into its agreement with Bradford in accordance with Ex. 4. Bhogal agrees that subcontractors work under Piedmont's authority, and they should be paid. That is about the only thing I agree with that Bhogal said. He admitted
                                                            -4-
that he did not ensure that Bradford was paid.
            I accept that the owner and contractor, Atlantic and Piedmont, respectively, accepted the relationship of trust and confidence established in Article 3 of Exhibit 4. As a general rule concerning this project, Atlantic acted as Piedmont's agent. In not paying Bradford what it had agreed, $78,190.00, Atlantic breached its "agreement" with Bradford. Piedmont also breached Atlantic's "agreement" with Bradford, which agreement Atlantic had made on Piedmont's behalf and for its benefit. Piedmont had very little complaint about Bradford's work, and Atlantic and Piedmont had the benefit of Bradford's work.
            Piedmont required Atlantic to provide Ex. 9, a signed "CONDITIONAL PARTIAL WAIVER AND RELEASE UPON PAYMENT." Mr. Iorio had never seen such a document except on construction projects involving developers, which he knew this project was. Exhibit 9 states: "The undersigned upon receipt of will have been paid a partial payment in the sum of $721,412.09 for labor, services, equipment, or materials furnished to the Contractor, Owner or Prime Subcontractor on the above-described Project. The undersigned (signed by Kevin Cullen) does hereby release pro tanto any mechanic liens, stop notice or bond rights that the undersigned has on said Project."
            Then with bold lettering, "NOTICE: "This document waives rights unconditionally and states you have been paid for giving up those rights.[4] This document is enforceable against you if you sign it, even if you have not been paid. If you have not been paid, use a conditional release form." The lien claimant is Atlantic.
Piedmont, doing this project as it has done all of its previous real estate projects, is now
---------------------------
[4]No evidence was offered as to any such payment "for giving up those rights."
                                                            -5-
covered (falsely) if any supplier of goods or subcontractor has not been paid, or if any mechanic's lien has not been satisfied. Piedmont wants to be "covered" so that it could not be held liable for, as in this case, nonpayment of work done by a subcontractor.
            Either at Piedmont's implicit direction and/or at least following Piedmont's explicit example, Atlantic required Iorio to sign a "lien waiver subcontractor." Ex. 12 and 13 state:
"In consideration of the receipt of the amount of payment set forth above and any and all past payments received from the Contractor or Owner in connection with the Project, the undersigned acknowledges and agrees that it has been paid all  sums due for all labor, materials and/or equipment furnished by the undersigned to or in connection with the Project and the undersigned hereby releases,  discharges, relinquishes and waives any and all liens, claims or rights to liens under the statutes of the Commonwealth of Massachusetts (including under any Notice of Identification, Notice of Contractor statement of account) with respect to the Owner, the project and/or against the owner on account of any labor, materials and/or equipment previously furnished through the date hereof." (Emphasis added)
The undersigned represents and warrants that it has been paid in full each and every sub-contractor, laborer, and labor and/or materials supplier with whom the undersigned has dealt with in connection with the project and the undersigned agrees at its sole cost and expense to defend, indemnify and hold harmless the owner and contractor against any claims, demands, suits disputes, damages, cost, expenses (including attorney fees) liens and/or claims of liens made by such subcontractors, laborers, labor and/or material suppliers arising out of or in any way related to the Project.
The undersigned individual represents and warrants that he/she is the duly authorize representative of the Subcontractor/Supplier, empowered and authorized to execute and deliver this document on behalf of the Subcontractor/Supplier and that this document shall be binding upon the undersigned.
Bradford's first invoice to Atlantic, Ex. 11, was for $25,200, and its second invoice, Exhibit 13, was for $45,000. Signing Ex. 12 and 13 was required by Atlantic from Bradford, at least in part based on Piedmont's explicit demand from Atlantic for a signed Conditional Partial Waiver and Release Upon Payment prior to Atlantic receiving payment.
            I did not find Mr. Bhogal very credible. At first he said that the signing of Atlantic's
                                                            -6-
conditional waiver, i.e. Ex. 8 and 9, was done in Piedmont's office in front of their notary.[5] But no signature by a notary is on either document. Bhogal had initially said that there was a notary in his, the LLC's office and that the contractor would bring the equivalent of Ex. 8 and 9 over to be notarized. But he later did not even remember if his LLC then had a notary. Then he said that the notary must have been in Atlantic's office.
            Article 12.1.4 of Ex. 4 is about payments, including progress payments. 12.1.4 states: "With each Application for Payment, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment."
            By Exhibit 8, Atlantic is seeking to be paid $721,412.98. I do not credit Bhogal's testimony that he reviewed Bradford's canceled checks, invoices with checks attached. He may have reviewed some subcontractor's invoices or left that for the architect. I do not credit Bhogal's belief that he had seen in 2015 Bradford's incurred bills with checks attached. He did not mention what his general practice was; he claimed to actually remember seeing Bradford's invoices with a paid receipt. Not only is it unbelievable as he had no reason to remember Bradford being paid in 2015 or even in 2016, but there cannot be more than a single cancelled
---------------------------
[5]The alleged "notary" in this case is basically worthless, as it is only a stamp, not even a notary signature. Ex. 8 and 9 appear to have been signed on January 15, 2016. The Legislature criminalized some behaviors by notaries effective January 4, 2017, including if the notary does not sign and does not keep track of for what the notary stamp is used. But apparently Piedmont is just using a notary stamp without actually getting the document notarized. No signature by a notary of what he/she has witnessed is on those documents. Both Ex. 8 and 9 are stamped with the name of a notary public, whose seal appears to state that her commission expires on June 30, 2017. The stamp is worthless without a notary's signature.
                                                            -7-
check from Atlantic to Bradford as Bradford has only been paid one check for $25,200.00. No honest person would remember four years later the specifics of what invoices they had seen and with what attachments, in terms of his description in 2015. I just do not believe him.
            Mr. Bhogal testified that Piedmont had to get bank money to pay Atlantic. A developer who cannot pay the amount of money, $721,412, without getting bank money has no basis to expect that the general contractor will have already spent that much money of his own before getting paid a penny by the owner. In my experience of 20 years hearing trials, I have never understood that general contractors have lines of credit at a bank in anywhere near this amount of money. General contractors do not generally have the wherewithal to pay anywhere near this amount of money, $721,000, without first getting paid by the owner. Not even Piedmont could pay that bill without receiving bank money.
            So, what Piedmont, what Bhogal as one of the LLC's two managers, wanted was "cover." They got "cover" by these false lien waivers. Based on Piedmont's implicit direction and explicit example, Atlantic required of its subcontractors what Piedmont required from Atlantic.
            Exhibit 12 and 13 are the Lien Waiver-Subcontractor. Atlantic understood that this is what Piedmont explicitly required of Atlantic and, as a consequence, Atlantic required the same from its subcontractors. Besides having to (falsely) state they have been paid when they have not, Ex. 12 and 13 also require, as a condition of receiving payment from Atlantic, that Iorio and Bradford not apply for a mechanic's lien. Those phrases, Notice of Identification, Notice of Contractor, statement of account, were intentionally used in these Lien Waiver-Subcontractor. By Ex. 12 and 13, the subcontractor had to "release, discharge and waive" all liens, including mechanic's liens; this language precluded Bradford from filing any mechanic's lien under Chapter 254 Section 2A or 2B. In doing so, Atlantic was following Piedmont's explicit
                                                            -8-
example and implicit direction.
            By requiring the subcontractors to in writing under the penalties of perjury agree they have already been paid, which Atlantic would know was false, Atlantic's actions were unreasonable, unconscionable, unfair and deceptive. By requiring Atlantic to falsely swear under the pains and penalties of perjury that it had been paid when Piedmont knew Atlantic had not been paid, Piedmont's actions were also unreasonable, unconscionable, unfair and deceptive.
            Bhogal and Calus were the only managers of Piedmont. Bhogal has been involved in various LLC's numerous construction projects. Both Bhogal and Calus knew or should have known that they were not dealing with a general contractor who had its own substantial line of credit or its own way of paying the subcontractors or the suppliers without receiving money from the owner.
            Iorio signed Ex. 11 and 13 as the vice president of Bradford sales. In Ex. 13, Iorio requested $45,000, as he had when he sent months earlier the requisition, application and certification for payment. Since then, Bradford has never been paid. Bradford never filed a mechanic's lien because it thought they had been barred from doing so by signing Exhibits 11 and 13, though they have continued to make requests to both Atlantic and Piedmont for payment.
            Bradford had a lawyer send on July 27, 2016 a Ch. 93A letter to both Atlantic and Piedmont. Piedmont never responded; all that Piedmont did was to send the notice to deal with it to Atlantic, who also never responded to plaintiff's Ch. 93A letter. Exhibit 14 satisfies the requirement of a Ch. 93A letter in this case.
            Now, the process, according to Bhogal, is that when Piedmont gets a requisition from Atlantic, Piedmont gives it to an architect to verify that the work was done and that the receipts are there. Then Piedmont sends it to the bank to receive payment, and once Piedmont has
                                                            -9-
received the bank's money and has also received Atlantic's signed Conditional Waiver, Piedmont then pays Atlantic. Exhibit 9 is the Conditional Partial Waiver and Release that Piedmont required from Atlantic.
            Bhogal claimed that it was done "in parallel", i.e. payment paid on the same day once Piedmont received the signed waiver. Bhogal claimed that at the time and date Atlantic signed Ex. 9, the Conditional Waiver and Release upon Payment and the requisition, Exhibit 8, that Piedmont then paid the general contractor that same day. First Bhogal said Ex. 8 and 9 were signed on the same date before a notary in the LLC's office. Then he backtracked on that because that turned out to be totally false. He did not even know if his LLC then had a notary. Second, Bhogal initially said Piedmont always paid by check; then he said sometimes Piedmont had to wire the money. I just do not credit that Piedmont's payment was paid that same day. Maybe they tried to do it as a "parallel event," i.e., same day though after receiving the signed (false) Conditional Waiver and Release. With his numerous corrections to his testimony and without any documentary evidence supporting his testimony, I do not credit Bhogal's testimony. Even if Piedmont paid Atlantic the same day as Ex. 9 was signed, it is still unfair and deceptive for Piedmont to require a false statement, Ex. 9, from Atlantic, that it has been paid when Piedmont knows Atlantic has not yet been paid.
            Piedmont wanted assurance, even false assurance, that the subcontractors and suppliers' bills and invoices had all been paid. Piedmont would not pay the general contractor until it provided Piedmont with documentation that was false and that Bhogal and Calus would have known, or at least should have known, was false. Piedmont wanted "cover" so that when the project ended, they could close out, everything that remained was their profit, and they would have no obligation to pay any subcontractor or supplier that had not been paid. But it is totally
                                                            -10-
unrealistic to think that a general contractor who is awaiting payment of $791,000 has already paid all the subs and suppliers before getting paid any of that money from the developer. Even Bhogal agreed it would be improper for Exhibits 12 and 13 to be required to be signed without first getting payment. Bhogal is basically admitting that requiring the conditional partial waiver, Exhibit 9, be signed is improper.
            I do not credit that the signed application, Exhibit 8 or 9, was always done on the same day in exchange for a check or a wire. No subcontractor or supplier, or even general contractor should be required, on condition of getting paid, to sign on the pains and penalties of perjury that all obligations have already been paid, when they have not. No subcontractor, supplier or general contractor should ever have to sign that it has been paid when it has not been paid. At least in this case, neither Piedmont's architect nor either of Piedmont's managers could have seen any check to Bradford for $45,000 as Atlantic has never paid the $45,000 invoice (Ex.11). Atlantic only paid Bradford's first invoice for $25,000.00.
            This was a very profitable project for Piedmont and its two managers. They bought two pieces of land, combined them, paid the general contractor almost $6,000,000, and then sold all eight condos for a gross estimate of $16 million. It does not matter whether Piedmont made a lot of money or lost money. Requiring Atlantic and Bradford or any party to sign a document that it has been paid when Piedmont and Atlantic know, or have reason to know, that the one owed money has not been paid, is an unfair and deceptive act.
            In each instance, Piedmont and Atlantic acted to secure benefits for itself, the breaching party and both acts constitute unfair and deceptive acts. Anthony's Pier 4, Inc., vs. HPC  Associates, 411 Mass. 451, 474 (1991). These acts were done willfully and knowingly by Piedmont and Atlantic. Piedmont did it to get "cover" that all of its subs and suppliers had been
                                                            -11-
paid. Atlantic is a little less culpable. It had a huge contract, a $6.5 million contract, and those do not come around very often. But that does not mean Atlantic can be unfair and deceptive. Piedmont certainly acted knowingly and willfully in requiring Atlantic to sign Exhibit 9. As a result of Piedmont's explicit example and implicit direction to Atlantic, Atlantic also acted knowingly and willfully but is slightly less culpable.
Rulings of Law 
            Atlantic and Piedmont violated the "agreement" Atlantic entered into with Bradford. More than the email agreement between Atlantic and Bradford was not required. Atlantic and Piedmont are also liable in quantum meruit as both had the benefit of Bradford's labor without fully paying for it.
            With respect to the Ch. 93A claim, all three entities, Bradford, Piedmont and Atlantic, acted in trade or commerce. The definition of "person" for Ch. 93A includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Both Atlantic and Piedmont are an LLC, and both are within the parameters of 93A. Bhogal, and his partner, Calus, have been involved in numbers of construction projects in Boston. They have done all of these development projects, according to Bhogal, in the same way, which I take to mean looking for "cover" from the general contractor that all of its subs and suppliers have already been paid.
            Bhogal said that having received from Atlantic signed lien waivers meant that the Plaintiff had been paid $25,200 and $45,000. He had no basis for believing that Atlantic could always pay that amount of money without first getting money from Piedmont. He just made an assumption, and he wanted the written "cover" for that assumption that he made. Since Atlantic never paid Bradford more than $25,200, Bhogal could not have seen any check other than a
                                                            -12-
single check for $25,200 from Atlantic to Bradford.
            Piedmont set the example, a rotten, illegal, horrible example, but that is what Piedmont did. Atlantic then followed along with Piedmont's example. Mr. Iorio testified that it was only in cases like this, with a developer involved, that he had to sign these waiver of liens. That has to stop. It is an improper, illegal act to require someone to sign that he/she has been paid when the person knows, or at least has reason to know, that the person has not been paid. PMP  Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975) (Standards for determining whether a trade practice is 'unfair' include: the practice whether (1) it is within the penumbra of some common law, statutory or other established concept of unfairness; (2) it is immoral, unethical, oppressive or unscrupulous; and (3) it causes substantial injury to consumers (or competitors or other businessmen)."
            All three of those requirements have been satisfied by Piedmont requiring its general contractor to sign a false statement about having been paid when Piedmont knows it has not been paid. Certainly, Piedmont never paid until after it had Exhibit 9. All three of these requirements have also been satisfied by Atlantic, which, by following Piedmont's explicit example and implicit direction, required its subcontractors to sign a false statement that it had been paid when Atlantic knew, and Piedmont knew or had substantial reason it should have known, that Bradford had not been paid.
            It is clearly immoral, unethical, oppressive and unscrupulous to require anyone to falsely say he/she has been paid when the requestor (Atlantic and Piedmont) knows that entity has not been paid. Such actions cause substantial injury to a business who has to front, as Bradford did here, all of the weekly wages for all of its laborers who did the installation and the finishing of the wood floors, and then not get paid since 2015 by Piedmont or Atlantic.
                                                            -13-
ORDER OF JUDGMENT 
            Judgment enters for plaintiff in the amount of $81,190 on all three counts as to both defendants. This judgment is trebled as to Piedmont and doubled as to Atlantic. Plaintiff is also entitled to costs, attorney's fees and prejudgment interest since October 29, 2015, the date Iorio signed Exhibit 11. The judgment is joint and several as to Atlantic and Piedmont only up to the judgment amount (doubled) against Atlantic.
            Plaintiff's affidavit of attorney's fees should be sent to defendant's counsel within 21 days, opposed within 14 days and then filed in Newburyport with a copy to the undersigned in Lawrence. 
@/s/Elizabeth M. Fahey, Justice of the Superior Court
@October 2019
                                                            -14-
xxz